Good morning, Your Honors. May I please the Court? Artem Seryan for Petitioner Ms. Martirossian. When I took this case, it seemed to me that it was pretty straightforward. She was attacked and harmed by skinheads on several occasions in Moscow. Her throat was cut with a broken bottle. Her husband was beat up. Her kids were beat up. She was grabbed by the police and her husband was told that we're going to do whatever we want with her, implying she will be raped. But I was surprised to find out that the agency decided that it wasn't enough for persecution. It wasn't harsh enough, and rather all those acts were mere coincidences and random acts of violence. Well, they found that, I guess we'll have to break them out by the incidents, but specifically with the attack in the marketplace, that was the finding, was it not? The finding was that the skinheads just attacked the market and she happens to be there. The problem was the skinheads, when they attacked the market, they were targeting persons with dark complexions and black hair who happens to be Ms. Martirossian. So attack on Ms. Martirossian is because of her ethnic background, not because she happens to be standing in the Russian market. Had she been a blonde and blue-eyed, she wouldn't be attacked. But I guess the question I was focusing on was the board found that there were a number of people who were attacked by this group in the marketplace, and the question was whether or not it was focused on her specifically or whether it was a random act of violence. My focus on her was because of her ethnicity, and others were attacked because of their ethnicities. The slavs were not attacked. Most importantly, when the police visits her at the hospital, they convince her to drop the report. They specifically tell her, look, there's no such thing as skinhead violence. In fact, and then they say, if you continue to complain, they're going to go after you. In other words, police is acting there on their behalf, convincing her to drop the report. Then the agency turns around and says, well, you dropped the report, therefore that's not serious enough. There was Professor Anderson, a former CIA employee, a former intelligence officer, who currently is a professor at UCLA. He testified very clearly that she has a reasonable fear of return. She will be targeted. Wasn't there a finding by the immigration judge that the professor was not competent to render the opinion testimony? But that was overturned at the board, and the entire finding of the judge that she was not credible was overturned by the board. They said she was credible. By that definition, everything that comes in is credible. All the testimony comes in as a fact, and Professor Anderson's testimony as well comes as a fact. So the second thing that the agency said, that, look, there is no future fear of persecution because husband happened to be relocating in another place. But she testified that he was in hiding. He lost his business. He's not employed anymore. He's employed in the random jobs in the construction, and he's cautious by moving around, making sure that he's not attacked. He hasn't suffered any other incidents in this town? Well, but the daughter was, there was attempted rape of a daughter in that town. There is an affidavit from the daughter, and also there was evidence in the country condition report that several skinheads were persecuted for a number of murders in that specific town. But I guess the question is, how do we know that that was related to ethnicity as opposed to general criminal conduct? Well, because there's skinheads. Is it because it was skinheads who were involved? Is that right? Right. Is that your argument? That's correct. The State Department report says the skinheads, the fascists, were involved. And as we all know, based on their life experiences, they're usually targeting either ethnic minorities or, you know, they're not targeting for political opinion usually. Well, I thought they also target Jews. For ethnic, for ethnicity. But isn't culture. Not for any other reason. Okay. So all of these facts, cumulatively or separately, they do amount to the past persecution. We believe that she's demonstrated past persecution. Therefore, presumption arises that she will be persecuted in the past. If this court finds that the cumulatively all the harms that she and her family, her husband, her kids suffered in Russia does not amount to the past persecution, then obviously our argument is that she still demonstrated that she has a well-founded fear of future persecution. She only needs to demonstrate 10 percent probability of being harmed. And in this case, not only Professor Anderson testified that she has a well-founded fear of future persecution. That testimony is totally ignored. Also, Dr. and Professor Papazian also testified that. Further, this court's case, which is the precedent at this point, Avetova-Yeliseyeva found that there is a pattern and practice of persecution of Armenians in Russia. With the less number of incidents, it was more of a harassment for Ms. Avetova-Yeliseyeva in 2004. And this court still found that she had a well-founded fear of future persecution. Counsel Judge Gould, if I could interject a question. Yes, Your Honor. I felt, based on the briefing and what I reviewed, that she had a very strong case of persecution in the Moscow area. And the only question in my mind, so I hope you might address it in a bit more detail, is whether the government meets its burden of showing she could safely relocate in the Tver, in the area where her husband is, on the theory that, okay, if, assuming she had persecution, she could relocate. So why is that incorrect? The reason for that incorrect is just mere fact that the husband was able to escape persecution in a specific city by hiding doesn't show that that specific place is safe for her. Further, she was also not only targeted by skinheads, Judge Gould, but also she was targeted by the police. And once we have a government involvement, we have a presumption that relocation is not reasonable, besides the fact that the government has to carry that burden. Finally, Professor Anderson specifically testified that the Russian National Unity, which was sponsored by the police, the group of skinheads, so my argument would be that not only the police was targeting her and relocation is not reasonable, I also would argue, based on Professor Anderson's words, that those skinhead groups were also sponsored by the police, as his testimony shows. So not only is it not reasonable for her to relocate, government couldn't carry the burden by simply saying, well, your husband just was hiding in Tibet, and therefore, you know, he's not harmed. She testified that the kids were attacked there. Daughter was grabbed by skinheads and almost raped in the same city that the husband was presumably safe, that he wasn't. Thank you. That's very helpful. If you don't have any questions, may I request that we start the rebuttal? Thank you very much. May it please the Court, Jonathan Robbins here on behalf of the respondent, Eric Holder. Good morning, Your Honors. As you just discussed, there are two main issues before the Court today. The first issue is whether or not the record compels reversal of the agency's denial of asylum, withholding of removal, and cap protection. And then the second issue is whether or not the Board abused its discretion in denying Petitioner's motion to reopen to essentially apply for the same forms of relief. So with respect to the Board's first finding with the underlying asylum claim, the Board in this case correctly found that Petitioner did not undergo past persecution. And in making that finding, the Board noted two things. The first is that she didn't suffer harm rising to the level of persecution, and the second is that she didn't demonstrate that the Russian government was unable or unwilling to control that. Now to that point, there is only one incident in which she claims that she actually underwent any past persecution. And that incident involves the incident that is discussed from February 13th of 2002 in which the skinheads attacked this market. And the Immigration Judge and the Board noted that she was in the wrong place at the wrong time at this incident, certainly. Did the Board note that? Did the Board say that she was in the wrong place at the wrong time? The exact language of that was the Immigration Judge's decision, but the Board upheld the Immigration Judge's decision, yes. But they specifically addressed that incident, and they didn't say what the IJ said. Well, the Immigration Judge did, and the Board specifically upheld the Immigration Judge's finding in that regard. And if you want to look at the Board's exact language in regard to past persecution, it says that the evidence showing that the respondent and others were assaulted at a market in Moscow in 2002 by nationalists or skinheads that the police failed to apprehend does not establish that the police were unable or unwilling to investigate. Well, correct. That was also part of the Immigration Judge's finding with respect to inability or unwillingness to control. And certainly the record indicates that. You say in your briefing, because I'm a district judge, I don't deal with these cases on a kind of regular basis, fortunately. To what extent is the Immigration Judge's finding? You say in your brief that it sort of provides guidance for the Board's decision. Am I reading that correctly? Well, certainly, I mean, the Board isn't going to repeat word for word everything that the Immigration Judge says, and they do have to uphold specific findings by the Immigration Judge. But I think my reading of the Board's decision is that they upheld the past persecution finding, which would include the fact that it doesn't rise to the level of persecution. And in fact, I think the Board even cited the Court's decision in Ochave to demonstrate that this didn't rise to the level of past persecution. So I think it would be a very strange reading to say that the Board didn't uphold the finding with respect to a claim that she didn't establish harm rising to the level of persecution. Well, that's a separate story. But I'd like to go through with you some of the incidents that I believe she testified, aside from being cut on the neck with a bottle during this incident, in which she was discouraged by the police from even pressing it, if you believe her testimony, which the Board did. Well, with respect to those incidents, I want to be clear. She was grabbed by the police at her place of work, who threatened to detain her and do whatever they want with her and blow up her husband's garage. Her home was broken into and vandalized. I'm just going through this quickly. And on three or four occasions, she was stopped by the police and forced to pay small bribes that nonetheless constituted her last penny. And do we have to look at one incident or can't we look at the cumulative effect, even if one incident is not adequate? Well, those specific instances relate to the second part of the analysis, which is a well-founded fear of future persecution. But right now I was just talking about the Board's decision with respect to past persecution. And with respect to past persecution, she can't use the incidences that happened to other family members to demonstrate past persecution. Well, she says she was grabbed by the police at her husband's place of work, who threatened to detain her. Right. She was grabbed. This is also indicative of a separate problem here. She's making a claim that she's afraid of the skinhead nationalist movement in Russia. And police extortion and police bribery, I'm not arguing that certainly the police are probably somewhat corrupt in Russia, but that's separate from them being unwilling to control the skinhead or nationalist movement. The fact that police may have attempted to bribe her at some point. They asked for bribes from her. I'm sorry, what? They asked to be bribed. They didn't bribe her. Yeah, well, yeah, that's what I'm – I'm sorry if I misspoke. But, yes, that's – again, that's a separate issue distinct from her actual claim that she's making, which is that she's going to be persecuted by the skinheads or by the nationalist movement or ultra-nationalists in Russia. So, you know, they're trying to blur the line about, you know, police bribery and to use this to sort of demonstrate that the police are in cahoots with the skinheads, but that's not really the case, and that's pretty much – the record really goes against that because the record talks about how the Russian government is actually trying to crack down on the skinhead, ultra-nationalist movement. And certainly when we're looking under the correct standard of review as to whether the record compels reversal of the immigration judge's finding in that regard, given the fact that we have all this evidence that shows the Russian government is trying to crack down on the skinhead movement, certainly the immigration judge's finding in that regard is supported by the record. Passing over how effective or how – with what vigor they're doing that, I want to ask you – Let's take a look at that because we have a specific instance here where they did act. The petitioner testified that when she underwent this attack in the market, the police did investigate. She says that they advised her that it might go nowhere, that she might get – No, she said her exact words. Actually, it's not exact. Her exact words is they told her that she would be better off dropping the case because there would likely to be retribution against her. That's true, but they didn't force her to close the case. And in fact, the documents that she submitted – Well, I mean, is it normal for police, when someone is a victim of a crime, let's say in this country, to tell the victim drop the case? Don't press charges because you're going to be retaliated against? I mean, does that reflect a police force that's interested in vigorously investigating this particular incident? Well, we don't hold the police to the standard that we hold in the United States when we're looking at whether or not they're unable or unwilling to control. What we do is we look as to what the police did. The document that she submitted that was dated over a year after the incident indicated that the case was assigned to an officer, and so that's the document that she submitted herself. Well, so it was assigned. Nothing happened. There were a lot of witnesses. There was no one prosecuted. I thought that document was shown to be fraudulent. Well, that was not upheld, so we have to take the document that she submitted as true. They didn't uphold a finding that the documents were fraudulent, although that did happen in lower proceedings. The immigration judge did find that, but the court doesn't look at that. Well, you certainly spent a little bit of time explaining all of this in your brief, even though the board rejected it. Look, we give the court a full history of what happened, but it is the government's position that that has to be taken as true. When you take it as true, it supports the government's position because it's dated over a year after the incident, and it indicates that the police were conducting an investigation based on this incident. Counsel, before all of your time has concluded in argument, could you please address the issue that I inquired on with your colleague, whether assuming there was persecution, that all this stuff arose to that level, whether the government has met its burden of showing she could safely relocate. Certainly. Yes. Well, as an initial matter, it's not the government's burden. It is the petitioner's burden to demonstrate that she could not be reasonably expected to relocate. It's only the government's burden when it's the government is presumed to be doing the persecuting, not the skinheads. With the skinheads, the burden is on them. Now, and I would also note that they never at any point in lower proceedings argued that the agency improperly applied the burden, so they accepted that the burden was on them in lower proceedings. That's only something that they're sort of raising now for the first time. Now, with respect to the burden, the record— But on that issue of the burden, I thought we had an en banc case pending addressing that. Well, if there's a pending case, I'm not quite familiar, but I'm pretty sure the regulations explicitly state that the burden is on the alien, unless it's a government persecution, in which case the regulations state that the burden would be on the government. So the burden depends on the situation. The regulations are pretty clear on that. You're saying the regulations draw a distinction between who the persecutor is. Is that right? Government versus non-government. I believe so, yes. All right. So assuming that she can show past persecution, what is the evidence that she can safely relocate to Tiver? Well, the evidence is her own testimony that her husband continues to reside in Tiver and hasn't undergone any incidents of persecution. But if one person in Tiver who is Armenian is not persecuted, then we could assume that none of them are. Well, the question is whether the record compels reversal of the finding. So what we have here, the only evidence we have regarding relocation, and it's her burden again, is that her family members continue to reside there unharmed. And this notion that the husband's in hiding, that's not what they testify to. They testify that he had a new job there, that he was a painter there, working there, that they specifically took their kids there to avoid the problems in Moscow. So they certainly felt that they could avoid problems if they relocated. And, again, the evidence demonstrates that they haven't faced any problems since that time, and that's a matter of a couple of years. I know he talks about this instance regarding the daughter undergoing a problem there, but that wasn't raised in proceedings below, and it wasn't part of the evidence at that time. That was raised in the context of a motion to reopen later on. So with respect to the relocation, and they didn't address the relocation finding in their actual motion to reopen. They didn't address it at all. Can I ask you a couple of quick questions because your time is running out? Of course. In denying the motion to reopen, there was a sentence that said that the evidence that she submitted, I'm reading from the board's denial, reflects a continuance of ongoing and volatile conditions for ethnic minorities in Russia. Yes. And that this was not new because there was nothing new about that. Correct. So is this fundamentally a recognition by the board that there is ongoing and volatile conditions for ethnic minorities in Russia? Well, it depends. I don't think they were saying that there's a pattern and practice of persecution, if that's what you're saying. Well, there's no magic words about pattern or practice. We're talking that it's just the label. Well, I think everybody could agree that there are certainly problems for ethnic minorities in certain circumstances in Russia. Well, it's more than that. It says such evidence reflects a continuation of the ongoing and volatile conditions for ethnic minorities in Russia. Yes. Russia includes Tver. Yes. But, again, if you look more deeply at the different country reports and the state reports, the incidences of ultranationalism are mostly focused on the bigger cities like Moscow. Well, this is only an hour away from Moscow, as far as we know. Well, again, the standard is, does the record compel reversal? In other words, is the only way the immigration judge could have determined is that she would be persecuted. And given the fact that her family member was able to successfully relocate, it can't be said that the record compels a conclusion that they can't relocate. And what is the status of her children, by the way? They're in the United States now, as I understand. Yes, all three are in the United States. And what is their immigration status? I'm just curious. As far as I know, the first two children, the two oldest children, were in separate asylum proceedings. I don't know. I tried to find out. I don't know how those proceedings went, but they were a while ago, so I assume they're over. Mr. Sarian might be able to shed light on that, on his rebuttal. I know that they indicated in their document regarding the response to the executive action order that the court issued that Eric, the youngest son, is a derivative on the mother's application by virtue of having been included in the original asylum application. But he's not a rider, in other words, so he doesn't have a final order of removal pending against him. He wasn't part of removal proceedings. And what's the likelihood that she'll be deported if you win? I don't know. I don't want to make any guarantees on anything. Well, she's not among the priorities in the president's policy. She doesn't appear to be, but I want to be careful about that because when the court issued the order with respect to the executive action, the first thing we did, as we do in all our cases, we reached out to opposing counsel to see if they wanted to pursue relief. And your honors will note that they filed the document saying that they did not want to pursue relief under the executive action. So it got cut off, essentially, there before DHS. So DHS looks at every case on a case-by-case basis to determine whether they're a priority, whether they're not. So DHS hasn't made that determination in this case. But we know what the priorities are. And as I read the document, I guess it's an order. It's not an executive order. It's a directive. Right, it's a memorandum. She falls within a category. It's not clear on this because there are certain factors that may include her as a priority because of the problems with the fraudulent documentation and underlying proceedings. I don't want to make a representation for DHS that they haven't made. All I'll say is that that's something that DHS would have to look at if that were a form of relief they're requesting, but they don't want that. So we haven't gone down that road with DHS to determine what to have that analysis happen as to whether they're a priority. Our order only asks whether DHS was willing to or Homeland Security was willing to engage in mediation. Right, we were willing to do that. Yes. But, again, that's something they've indicated they do not want. I know, but that doesn't necessarily mean that if you look at the document itself that she comes within the category of those who are in a priority. She has no criminal record. Forget what the other criteria is. And she was in the country before a particular date. I agree. But one of the priorities is also a fraud or significant fraud of the visa program. I don't know if this would qualify or not because it wasn't upheld at the different proceedings. So, again, I can't make a determination as to what DHS might do, but I'm just saying it's not set in stone that she's not a priority. She might not be. She might be. I don't want to make a representation one way or the other because that's something for DHS to look at in a situation where it would be appropriate. But, again, not appropriate in this circumstance because they don't want to pursue relief under that executive action authority. Mr. Robbins, you're six minutes over. I'm sorry. No questions here. I appreciate the presentation. I think we'll let Mr. Sarian have the last word. Thank you very much for your time, Your Honors. Just a quick reply on the status of the kids. I don't represent the daughter. She had asylum pending. As for the son, I do represent the son. His hearing is scheduled for July of 2015 before Judge Travieso in the Los Angeles Immigration Court. He seeks asylum pretty much on the same basis. Jumping back to the I-would-like-to-cover-quickly motion to reopen, we submitted a lot of evidence showing severe escalation. There are probably 30 articles that show that the situation is much, much, much worse and dire in Russia than today. It covers the entire country. Our brief clearly states and gives exact words what those reports are, reading reports. The brief specifically said, expert witness specifically said that there is escalation. The second expert witness that they claim was available previously, who wasn't, also specifically states that she could see the worst if she returns to Russia. Bottom line is this expert witness was available. In fact, there's a Ninth Circuit opinion which found the patent, which you've already alluded to, relied on that very same expert. The fact that expert is alive and in general available, generally available, did not make him available to her. Her attorney chose Dr. Anderson, which is a fine and competent expert who also confirmed the fact that she has well-founded fear. It's just when the case got to us, I decided, based on the Ninth Circuit case law, that Dr. Papazian is also a very good expert. And I just contacted him and got his testimony. When did you come into the case? When the second board did denial of asylum, at that point, we jumped in, we filed petition for review, and we filed motion to reopen. So I represent her at the end, and when I analyzed the case, I decided that, you know, opinion of Dr. Papazian would be helpful here, since the court previously dealt with him. Finally, just quick, the fact that the government trying to separate, she only had one attack at the market, but the beating of her husband doesn't count because it's not her, it's her husband, you know. Police comes to his garage, beats him up, threatens to rape her, and then says, your business could be blown up next time. Coincidentally, a couple of weeks later, skinheads come up and fire bomb his garage and burn it, you know. It all shows the fact that they're all together, they're all in cahoots on this thing. So government, of course, is going to argue that it's just a mere coincidence and separate, unrelated accidents. But in reality, they're all connected, they're all tied together, they're all tied together by the expert as well. I see one last question. I'm sorry, Judge. Well, my question was, do you agree with the government's position that your client has the burden to show an inability to relocate safely? I disagree. The way I understand the law, that if past persecution is established, it's government burden to show that she can safely relocate. If the persecution was on the part of, from the hands of the government, it's absolutely government's burden to show that she can relocate. If it was in the hands of the private persons, then only government burden comes to play when there was a past persecution. That's my understanding of the law. I thought it was, if she establishes past persecution, it raises a presumption that she will suffer future persecution. And then the government can rebut that persecution with evidence that she can safely relocate, which they offered and which the immigration judge credited. And then the question becomes, does she have the obligation to offer anything further to challenge the government's evidence on relocation? The judge did not rule that she suffered past persecution. He ruled that those incidents are unrelated, she had only one incident. But I'm not sure you're answering my question, because whether the presumption arose or whether it didn't, there was evidence offered by the government of safe relocation. So then the question becomes, does she have an obligation to offer additional evidence to undercut what the government has shown on relocation? The government cherry-picked the evidence. They used her testimony, but they only cherry-picked the fact that they liked. They didn't use the fact that she said he's in hiding, he lost his business, he changed his job, now he's in construction instead of being a mechanic. They only used the fact that, okay, so he wasn't harmed, therefore he could safely leave there. I guess what concerns me, Mr. Sarian, is am I correct in reading the record that she didn't exhaust her administrative remedies on the relocation issue because it wasn't raised on appeal to the board from the initial immigration judge's decision? I believe they argued that that wasn't enough, the fact that he's in hiding doesn't show that he safely lives there. Who argued? That's a government argument. I think Judge Tomlin is arguing about it. I believe her previous counsel also argued that. I'm not suggesting you, I understand it was prior counsel, but the government, I think I heard Mr. Robbins point out that it wasn't raised on the initial appeal to the board of immigration appeal. I have to look through the record again. We can check that. Thank you. Can I ask you one more question? As you can tell from some of the questions, this is not an open and shut case for you. You're rolling the dice and not accepting mediation in the sense that you don't want mediation because you want to try and save her ability to get one of her children piggybacked onto her. But you could wind up with both of them being out of luck. Are you sure that you don't want to accept mediation? It's a very good question, and quite honestly, my policy is usually to accept mediation. We discussed it with the client and the fact that her son is now in proceedings. One of the sons is actually derivative from her asylum case, and another son is in proceedings. Based on the same fact, if we accept mediation, the government will place her in a legal limbo. She's going to have absolutely nothing other than a work permit. In fact, the ruling of the board that there was no persecution will stand, and the government will use it in the next proceedings of her son to say there was a ruling of the board that was unchallenged, and the fact that the board ruled there is no persecution, there is no future well-founded fear of persecution, and the son's case will be killed pretty much. But what if we stayed, to follow up on Judge Corman's suggestion, what if we stayed ruling on this particular case for a period of time? I don't know whether it would be 60 days or 6 months, in order to permit the two parties to explore mediation. Would she still suffer the same? I think I will be open for that. Again, the only reason we replied the way we replied is because we were instructed by the client to reply that way. So what's your position today? Well, if you're going to stay the ruling... Would you want us to defer submission while you talk to your client, in light of the argument, and get back to us? Or would you want us to stay, as Judge Corman said, just right now, enter an order, staying things for a period? That would be a great idea, I certainly would like that opportunity. Okay, but you still have to confer with your client, who may give you the same instructions that she gave you before. Absolutely. So, why don't we do this, why don't we give you a reasonable period of time, can you get back to us in two weeks? Absolutely. And tell us whether you wish to pursue mediation, and you can do it by letter. And if you say yes, then what we will do is enter an order vacating submission of this case, and hold it to give the parties an opportunity to meet. I'll do that. Presumably you might be able to mediate the child's status as well, in this mediation process. Okay, so technically for the record, as of today, we are submitting the case, but subject to word back from Mr. Sarian within two weeks by letter, as to whether he wishes to pursue discussions with the government. Thank you very much. Thank you both. Thank you.
judges: Korman, Gould, Tallman